ISABEL DONLON, as Administratrix, etc., of MORRIS F. DONLON, Deceased, Respondent, v. THE NEW YORK CENTRAL RAILROAD COMPANY, Appellant.

Fourth Department, December 30, 1919.

Railroads — negligence — action under Federal Employers' Liability Act — conductor killed while engaged in switching train — verdict for plaintiff against weight of evidence — failure to show negligence of defendant — contributory negligence of decedent conclusively established — assumption of risk.

Action brought under the Federal Employers' Liability Act against a railroad· company to recover for the death of a conductor who, at the time of the accident, was in charge of a wrecking train which was being switched from a side track to one of the main tracks of the defendant's road.   It appeared that the decedent was an employee of long experience and was familiar with the location.   His train had been moving slowly and when it was mostly upon the main track he alighted from a flat car on which he had been riding and stepped to the middle of the track for east-bound freight trains and while standing with his back to the west making a signal, was struck and killed by freight engines coupled together which, at the time he stepped upon the track, were close upon him, although moving slowly and which would have been visible for a distance of over 800 feet.   On all the evidence,

*Held*, assuming that it was essential for the plaintiff to show that the bell on the engine which struck the decedent was not ringing, she failed on this burden of proof as a matter of law.

*Held further*, that plaintiff failed to show any negligence on the part of the defendant or lack of experience of the decedent's fellow-servants which could be considered the proximate cause of his death, or that the accident could be attributed to the negligence of an employee in charge of a nearby signal station.

*Held further*, that although the burden of proof as to contributory negligence in actions brought under the Federal statute rests upon the defendant, conclusive evidence of contributory negligence was developed by the plaintiff's case, for upon the uncontradicted evidence there was no occasion for the decedent to leave his train until it was entirely upon the main track and it was unnecessary for him to go upon the track where he was killed with his back turned toward the line of travel and by so doing he assumed the risk.

HUBBS, J., dissents.

APPEAL by the defendant, The New York Central Railroad Company, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of Monroe on the 5th day of October, 1918, upon the verdict of a jury for $9,500, and also from an order entered in said clerk's office on the same day denying defendant's motion for a new trial made upon the minutes.

*Willis A. Matson* and *Paul Folger* [*Harris, Beach, Harris & Matson*, attorneys], for the appellant.

*Warren J. Cheney* [*James T. Foody*, attorney], for the respondent.

DE ANGELIS, J.:

On the 23d day of March, 1916, between eight o'clock and nine o'clock in the morning, the day being clear, in the yard of the defendant in the city of Rochester, where, in addition to its four main tracks running easterly and westerly, there are other tracks and sidings, a wrecking train, consisting of a locomotive and five cars, backing in an easterly course over a crossing from track No. 2, the west-bound passenger track, to track No. 3, the west-bound freight track, all the train except the locomotive having gotten upon and moving easterly upon track No. 3, the two cars in the rear being flat cars, the train moving slowly, and Morris F. Donlon, its conductor, standing on the rear end of the rear flat car, he got down therefrom to the ground on the north side of his train and into the middle of track No. 4, the east-bound freight track, with his back to the west, extending his arms as though giving a signal to his engineer, just as two locomotives coupled together and backing slowly easterly on track No. 4, reached the place where he stood, when the tender of the forward locomotive collided

with him, threw him down, and the forward trucks ran over him before the locomotive could be stopped. As the result of the injuries received thereby he died within two hours thereafter.

The plaintiff, his widow, as administratrix of his estate, has a judgment against the defendant upon a verdict awarding her damages for his death by reason of the negligence of the defendant in an action brought under the Federal Employers' Liability Act (35 U. S. Stat. at Large, 65, chap. 149, as amd. by 36 id. 291, chap. 143).

The defendant upon this appeal assails this judgment upon the ground that the defendant was not shown to have been negligent in the premises and upon the further grounds that, assuming the defendant to have been negligent, the plaintiff's decedent assumed the risk incident to going on track No. 4, and was guilty of contributory negligence as matter of law. The record shows that the counsel for the defendant requested rulings and took exceptions authorizing the defendant to urge these grounds to justify a reversal of the judgment.

Was the defendant guilty of actionable negligence?·

It is well known, and the evidence shows, that the defendant maintains a four-track railroad, the general course of which from Albany to Buffalo is easterly and westerly. At the time of the accident the most southerly of the four tracks was track No. 1, the east-bound passenger track, next was track No. 2, the west-bound passenger track, next was track No. 3, the west-bound freight track, and the most northerly track was track No. 4, the east-bound freight track. From center to center tracks 1 and 2, 2 and 3 and 3 and 4 were twelve feet apart. The gauge of each track was the standard gauge, that is, four feet eight and a half inches from the inside of the top of one of the rails to the inside of the top of the other. The top of each rail was about three inches wide. There was a track referred to as track No. 5 south of track No. 1 and there was a track referred to as a side track north of track No. 4. In the vicinity of the accident there were two crossovers, each permitting a train to be transferred from track No. 5 on the south or the side track on the north or any one of the four main tracks to any other track or tracks of the six tracks. There was also a signal station or signal tower, referred to in the

evidence as " the tower," south of the tracks, and there were semaphores and dwarf signals suitable for the proper operation of the defendant's railroad in the locality of the accident. The record does not disclose any fault in the equipment or management of the defendant's railroad in such locality at the time of the accident.

There are photographs and a blueprint map in the record showing the *locus in quo.* The scale of the map is fifty feet to the inch.

On the morning of the accident a wreck occurred at Otis, a place west of Rochester, which interrupted traffic on the defendant's railroad. A wrecking train was ordered to the scene of the wreck. The crane and the cars for the equipment of the wrecking train were located in a shed near the defendant's shops on the south side of the tracks at Atlantic avenue. Locomotive No. 143 was directed to proceed to the shed to get the wrecking train ready. The cars in the wrecking train were assembled in this wise, a flat car holding the crane was the first car westerly, next to it was another flat car known as the " idler " which accommodated the boom, then came the coach and dining car for the accommodation of the wrecking crew and then came two flat cars. Meantime there had been sent from the engine house on the north side of the tracks just west of Atlantic avenue locomotive No. 1790 to haul the wrecking train to the wreck. It was placed on the lead to track No. 5 headed to the west. When the wrecking train was ready locomotive No. 143 pushed the wrecking train westerly till it coupled with locomotive No. 1790. The order was given that the wrecking train was to take the crossover from track No. 5 northeasterly over tracks Nos. 1 and 2 to track No. 3 and to proceed on track No. 3 to the wreck. Locomotive No. 1790 backed the wrecking train easterly, followed by locomotive No. 143, until both had reached the switch of the crossover, about 300 feet west of the signal station or tower. Thereupon, the switches being reversed, No. 143 proceeded over the crossover and was followed by the wrecking train. Donlon, the plaintiff's decedent, was the conductor on the wrecking train and stood on the rear end of the rear flat car as the wrecking train moved over the crossover. The men operating the wrecking train, besides Donlon, the conductor, were Glenn,

Fourth Department, December, 1919.          [Vol. 190.

the engineer, Snyder, the fireman, and Nolan and Hale, the brakemen. When Donlon reached a point about 650 feet east of the signal station or tower and near semaphore 52, he got down from the flat car to the ground and over into the middle of track No. 4, the east-bound freight track, and stood with his back to the west and his arms extended as though signaling to his engineer. Just then two freight engines coupled together and backing easterly on track No. 4 came along and the tender of the forward locomotive collided with him, threw him to the ground, and the forward trucks ran over him, causing injuries from which within about two hours thereafter he died. No witness appears to have observed the manner of his getting from the easterly end of the flat car to the middle of track No. 4 and the evidence is such as to indicate that when he was seen in the middle of the track the collision was inevitable. The testimony of Nolan and Hale, the two brakemen on the wrecking train, given on the coroner's inquest, was read by the plaintiff. Nolan, who was on the east end of the flat car with Donlon, changed sides with him, Donlon going to the north side. These are the questions put to Nolan and his answers: "Q. What do you know about this accident? A. He [Donlon] was on this side, the right hand side. I was on the left. I left him on my side and when I turned to look he was off. Q. Was your train proceeding? A. Yes, sir. When I looked he was on the track and I hollered as loud as I could and he couldn't hear me, I guess, and he was hit and I went up and told them he got killed. Q. How far was the engine away from him the first that you saw him? A. About thirty feet, twenty-five or thirty feet. Q. He was on this track north of you, track four. You was on three? A. Yes, sir. Q. And when he jumped off did he tell you what he was going to jump off for? A. I didn't see him when he got off I had my face the other way and I turned and looked and saw him standing on the track. I didn't see him get off. Q. At that time the engine was about thirty feet, the two engines? A. When I hollered the engines were pretty near on top of him. Q. The first time you saw him they were about thirty feet? A. Yes, sir, thirty feet the first time. * * * Q. What part of the track did he stand on? A. Right in the middle of the track. Q. You hollered to him? A. Yes, sir. I hollered

as loud as I could holler.   Q. After you hollered did he have time to get off ?   A. It was too late, no.   Q. Did the other brakeman tell you he saw him jump off ?   A. No, he did not. Q. Do you know what he jumped off for now?   A. No, sir.''

It will be noted that this witness stated definitely that he did not see Donlon get off the car, although the counsel for the plaintiff sought such testimony from him.

Hale, the other brakeman, was on the other flat car next to the rear car.   These questions were put to him and he made these answers:   " Q. Did you see anything of the accident? A. I saw some of it.   I saw him jump off from the train and I paid no attention to him then, kept looking straight ahead and I heard the other brakeman holler and I turned around. I first looked at the brakeman and saw him looking that way and I turned around just in time to see the wheel going over him.   Q. And you saw him jump off?   He was the boss, was he not?   A. Yes, sir.   Q. It is the ordinary thing to keep your eye on the boss, is it not?   A. I don't know.   Q. Isn't that the natural thing to do?   A. I suppose so in some cases. Q. You saw him jump off; how did he get off?   A. I can't say whether he used the step or not.   I know he got off from the car and we went on by him.   Q. And where was he standing then when you went by him?   A. He was between the rails of Number 4.   *   *   *   Q. Did he go right over there between those two rails when he got off?   A. Yes, sir.   Q. And stood there?   A. I can't say whether he stood there or which.   I went by him.   Q. Did you see him there?   A. Yes, sir.   Q. He might have been walking?   A. He might have been.''

There was at the northeast corner of the rear flat car of the wrecking train one of the iron steps usually maintained on such cars.

Neither the engineman nor the fireman on the wrecking train saw the accident.

Raddicliffe, the engineer on No. 3032, the easterly of the two engines on track No. 4, testified that he was looking easterly along the track and did not see Donlon before the collision, but when he heard " somebody holler " he saw the man's legs fly around the front of the tank on the north side, and put the brake on and stopped his engine within a space of from thirty to thirty-

five feet.   He testified that he could not see an object on the track on his side within fifteen or twenty feet, and, on the opposite rail, within twenty to twenty-five feet.   The fireman on No. 3032 did not see the accident.   White, the engineman on No. 3016, called as a witness by the plaintiff, testified that he saw some small object fly and later saw that it was a man's cap and was on the back coupler of No. 3032.   The fireman on No. 3016 did not see Donlon till after the accident.   Forster, the fireman on No. 143, called as a witness by the defendant, testified that he saw Donlon in the center of track 4 with his back towards the engines about five feet east of the engines and that he appeared to be swinging the steam crane up.

Locomotive No. 3032, locomotive No. 3016 and the wrecking train were running slowly.   Only one witness thought that they were going five miles an hour.   Two of the other four witnesses testified that their speed was three miles an hour and the other two that it was four miles an hour.

The engineer and fireman on locomotive No. 3032 testified that the bell was ringing on it and the fireman on No. 3016 testified that the bell was ringing on it.   These witnesses were called by the plaintiff.   The fireman on the wrecking train was not willing to swear that the only bell that rang was the bell on his train.   Nolan, one of the brakemen of the wrecking train, testified that he did not hear the two engines coming and did not hear any bell ringing.   The coroner's minutes show that he was asked the following questions and made the following answers:   " Q. You did not hear the bell ringing?   A. No, sir.   Q. If the bell had rung, could you have heard it?   A. I suppose I would, I think so.   I didn't hear no bell ring.   When he got hit I ran and told the crew right away."

Hale, the other brakeman on the wrecking train, testified that he did not hear the two engines coming.   This question was put to him and he made this answer: " Q. Was the bell ringing on these engines?   A. There was a bell ringing; I don't know what engine it was.   I know there was a bell ringing."

Assuming that it was essential to the plaintiff's case to show that the bell on the light engine that collided with the decedent was not ringing, the burden was upon her to show that fact and I think we should hold as matter of law that the evidence does

not establish that fact. These light engines were not suddenly moved in upon the decedent. They were running slowly in an easterly direction on track No. 4 in plain sight of any one who took the trouble to look, for the distance of more than eight hundred feet before the collision occurred. The truth is that the decedent recklessly stepped into the pathway of these engines when only a miracle could have prevented the collision.

In my opinion there is no sufficient proof in this record to show that the plaintiff's decedent came to his death by reason of the negligence of the defendant.

The counsel for the plaintiff argues that the accident may be attributed to the negligence of the two brakemen on the wrecking train arising from their lack of experience. I am unable to discover the slightest evidence of any negligence on the part of either of these men which can be said to have been the proximate cause of the death of the plaintiff's decedent. The claim is also made that negligence may be predicated upon some act of the man in the tower, that he might have arranged the running of the light engines and the wrecking train in such wise that they would not have occupied their relative positions on tracks Nos. 3 and 4 which they occupied at the time of the collision. The space between tracks Nos. 3 and 4 had proven perfectly safe for the operation of the defendant's east-bound and west-bound freight trains for years. The space between tracks Nos. 3 and 4 was substantially the same space that existed between tracks Nos. 1 and 2 and 2 and 3, tracks Nos. 1 and 2 being the tracks used by the defendant's passenger trains of the greatest speed. It appears, and is common knowledge, that these trains are passing each other hourly with perfect safety. I am of opinion that the man in the tower was guilty of no negligent act that contributed to this accident. I have already referred to the management of the two light locomotives. The claim is made that the cars forming the wrecking train were improperly assembled. I find no basis for this claim.

Assuming that there might have been evidence of negligence on the part of the defendant, it is entirely clear that the plaintiff's decedent was guilty of contributory negligence as matter

of law. Although it is true that the burden of proof as to contributory negligence in actions brought under the Federal statute rests upon the defendant (*Central Vermont Railway* v. *White*, 238 U. S. 507), it is also true that conclusive evidence of contributory negligence may be developed in the plaintiff's case. Such evidence was given in the case at bar. Upon the uncontradicted evidence there was no occasion for the decedent's leaving his train until it was entirely on track No. 3 and had passed to a point considerably east of semaphore 52. The evidence is uncontradicted that light engine No. 143 was four or five hundred feet east of semaphore 52, had given the decedent sufficient clearance to enable his train to reach the point where track No. 3 would be open to him to proceed westerly to the wreck, and, beyond this, it was the duty of light engine No. 143 to keep out of his way. The decedent was an experienced railroad man, familiar with the locality, and must have known this to be the case. There is no view that can be taken of the evidence that will relieve him from the charge of negligence in taking a position on track No. 4 with his back toward the current of traffic with these two light engines approaching him and perilously near. They had been in plain sight for over eight hundred feet of their pathway. The jury were permitted to pass on the question of the contributory negligence of the decedent as a matter of fact and made a special finding under the direction of the court that he was free from negligence. The verdict cannot stand on account of this error.

Further, it seems to me, that the decedent assumed the risk of the collision when he voluntarily stood on track No. 4 with his back to the current of traffic.

It follows from the foregoing that the judgment and order appealed from must be reversed and the complaint dismissed.

All concur, except HUBBS, J., who dissents and votes for affirmance.

Judgment and order reversed, with costs, and complaint dismissed, with costs.